Leonard Leigh Finz, J.
The petitioner herein brings this proceeding under CPLR article 78 to determine whether the rates of reimbursement for Medicaid which were established by the respondent were determined in an arbitrary fashion *15 and without due regard to the laws governing the fixing of such rates.
In order to approach this subject properly, it is necessary to understand the statutes, regulations and laws which governed the fixing of such rates at the time in question, namely, the period from July 1, 1971 to September 30, 1971. Basically the statute covering the situation is subdivision 3 of section 2807 of the Public Health Law which requires the Commissioner of Health to certify the rates to the Superintendent of Insurance and the Director of the Budget, who shall approve the rates. It was required that the proposed rates be reasonably related to the costs of the efficient production of such service. In making the certification, the statute required the following factors to be considered:
1. The elements of cost.
2. The geographical differentials in the elements of cost to be considered.
3. The economic factors in the area in which the hospital or agency is located.
4. The rate of increase or decrease of the economy in the local area.
5. The cost of hospitals or agencies of comparable size.
6. The need for incentives to improve services and institute economies.
10 NYCRR Part 86 requires that these rates be computed on an annual basis and that the basis for determining the rates for a forthcoming year is the cost data reported by the hospital for the prior period (10 NYCRR 86.15).
In the year 1971 covering the period with which we are concerned, the Federal Economic Stabilization Act of 1970 (P. L. 91-379, 84 US Stat 799) was passed, which act purported to regulate wage and price increases. Under this act there was established an economic stabilization program which included regulations applicable to hospitals (6 CFR 300.18). This regulation directed that if there were a price increase which would result in more than 2.5% increase in the hospital’s aggregate annual revenues, a form S-52 with price and cost justification would have to be submitted to the Internal Revenue Service. In the event that the increase would be more than 6%, then the form S-52 would not be sufficient, but the hospital would be required to apply for an exception from the Price Commission. Thus the regulation promulgated under the Federal *16 Economic Stabilization Act was not mandatory, nor did it impose a duty on the Commissioner of Health to impose across the board strictures limiting increases to 5.5 % as applied to wages, 2Vi% to other costs, and 1.7% to new technology expenses (6 CFR 300.18 [d] [1] [i], [ii], [iii]). It would seem therefore that the violation of the Federal regulation, if any, would be a matter between the proper Federal agency (IRS) and the petitioner.
The affidavit in opposition made by William F. McCann, the Assistant Commissioner of the Division of Health Economics of the New York State Department of Health, presents a sobering view of the staggering increase in the costs of providing health care to the public under Medicare, Medicaid and Blue Cross plans. So staggering, he alleges, was the increase that the Legislature froze Medicare rates in effect on April 1, 1969 to cover the period up to and including June, 1971. What evolved was the present section 2807 of the Public Health Law designed to fix rates "reasonably related to the costs of efficient production of such service” subject to the other criteria above enumerated. It was directed that the rates would be fixed in a prospective manner. Thus the 1972 rates would be calculated late in 1971 using certified reports submitted by the hospital for 1970 and projected forward for both 1971 and 1972. Since the hospitals could not get the necessary data to the commissioner in time to calculate the rates from July 1 to June 30 of the following year, an expedient was adopted. When regularly established rates expired June 30, 1971 the department certified a prospective rate of 110% of rates then in effect for hospitajs in New York City. This was to be the "interim rate” subject to adjustment October 1, 1971 when new rates would be certified. This rate apparently came to $126.23 per patient day. Thereafter actual prospective rates were computed based on the factors previously stated and it is agreed that this rate came to "$133.68 per patient a day (as described in paragraph 9 of the petition).” This rate was to be effective October 1,1971 and to supersede the interim rate.
Before this rate could take effect, the President of the United States issued Executive Order No. 11615 (36 Fed Reg 15727) ordering a 90-day freeze on rates: During this 90-day period the Cost of Living Council promulgated regulations effective November 14, 1971 placing restrictions of 5.5% on wage increases, 2.5% and 1.7% on other factors as indicated above.
*17 "Therefore”, continues Assistant Commissioner McCann, "the projection factors used by the state in calculating the prospective rates for the immediately succeeding period no longer had validity”.
In effect, the commissioner took the position that section 2807 of the Public Health Law was no longer applicable to the situation and that State law had been nullified by the overriding Federal law. Since, as the commissioner states, the preESP (Economic Stabilization Program) projected figures had become "unrealistic”, he adopted the base rate that the hospital was receiving on November 14, 1971 (the freeze date) which was the "interim rate” above described and accorded the hospital 102.5 % of that base rate. The commissioner reasoned: "Since ESP did not require any cost justification for an increase in rates up to 2.5% of the base price, the Department determined that the increase of 2.5%, when added to the 10% or 8%, would be a good indicator of the movement of the new controlled economy without the necessity of showing any special or unusual costs”. (The 8% figure mentioned in the preceding quote has no bearing on the petitioner herein.)
Thus, the formula provided by law in section 2807 was abandoned (with laudable intentions on the part of the commissioner) and the respondent sought to steer a course between rigid acceptance of the price freeze and the demands of the hospital, satisfaction of which was absolutely necessary to enable the hospital to provide "efficient production” of health related service. The fact that the hospital received an increase by the method chosen by the respondent is not germane to the issue here. The selection of the method for fixing the rate, which was not mandated by any law, was the arbitrary factor which made the respondent’s position untenable. It would not matter that the hospital may be receiving more than it should, as the commissioner contends. What matters is that the rate be calculated according to law and if thereafter some conflict develops, the proper remedy may be sought, also according to law.
The argument that there should have been a joinder of the Director of the Budget for a complete adjudication of the issues herein does not in any way affect this decision, since ultimately the rates must be submitted to the director for his approval. The question here is not whether the director approved the rates, but rather the method of calculation of the rates before submission to the director for his approval. The *18 law does not indicate that the director participates in the calculation of the rates in any manner until they are submitted to him for approval. Nothing appears in the law to indicate upon what basis he might disapprove the figures, except if they were not calculated according to law in the first instance. Since there is no real controversy here as to how the rates were actually calculated, it would not appear that the presence of the Director of the Budget is essential to an adjudication herein.
There is a similarity between this case and that of Matter of Presbyterian Hosp. v Ingraham (78 Misc 2d 152, affd 49 AD2d 520) where the court directed its attention (p 156) to the method of fixing the 1973 rate schedule. There, the respondent had imposed a 6 % limitation on the over-all increase, pursuant, it was alleged, to Executive Order No. 11627 (Oct. 15, 1971; 36 Fed Reg 20139):
"If respondents considered the limitation merely as a factor in projecting economic conditions, they did so appropriately. However, to the extent they imposed the limitation as an absolute ceiling on projected increases in costs, without regard to whether it was in fact reasonably related to the actual increase in costs, then the rate schedules do not meet the requirements of subdivision 3 of section 2807; and respondents acted arbitrarily and capriciously in certifying them.
"Similarly, by limiting the increase in overall reimbursement payments to 6% above those of the previous year, without regard to the actual projected increase in 'the costs of efficient production,’ respondents failed to adhere to the requirements of subdivision 3 of section 2807. The possibility that petitioners’ total revenues could exceed the Federally mandated limit on increases in revenue is not properly the concern of respondents in setting the rate AHS is to pay for services rendered its subscribers.”
This decision was affirmed by the Appellate Division, First Department.
The rates heretofore fixed for the period in question are vacated and set aside and the respondent is directed to recompute the rate according to section 2807 of the Public Health Law and to adjust payment accordingly.